No. 21-56196

# In the United States Court of Appeals for the Ninth Circuit

_____

ROBERT J. BUGIELSKI and CHAD SIMICEK,
individually as participants in the AT&T retirement savings plan
and on behalf of a class of all those similarly situated,

*Plaintiffs – Appellants*,

v.

AT&T SERVICES, INC. and BENEFIT PLAN INVESTMENT COMMITTEE,

*Defendants – Appellees*.

_____

On Appeal from the U.S. District Court for the
Central District of California Case No. 2:17-cv-8106-VAP-RAO
Hon. Virginia Phillips

_____

**APPELLEES' PETITION FOR
PANEL REHEARING OR REHEARING *EN BANC***

_____

Allyson N. Ho
Ashley E. Johnson
    *Counsel of Record*
Paulette Miniter
Katie Rose Talley
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900
*ajohnson@gibsondunn.com*

COUNSEL FOR APPELLEES
AT&T SERVICES, INC. AND BENEFIT PLAN INVESTMENT COMMITTEE

## TABLE OF CONTENTS

Page

Table of Authorities ...................................................................... ii

Introduction and Rule 35(b) Statement ..................................... 1

Background ................................................................................... 3

Argument ...................................................................................... 7

    I.    The panel decision departs from Supreme Court precedent and creates a circuit split. ........................................... 7

        A.    The panel decision departs from the Supreme Court's decision in *Lockheed*. ........................................... 8

        B.    The panel decision creates a circuit split. ........................ 14

    II.    The panel decision will have serious practical consequences. ... 17

Conclusion .................................................................................... 20

Certificate of Compliance ........................................................... 22

Certificate of Service ................................................................... 23

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ......................................................*passim*

*Bugielski v. AT&T Servs., Inc.*,
2023 WL 4986499 (9th Cir. Aug. 4, 2023)...................................*passim*

*Comm'r v. Engle*,
464 U.S. 206 (1984)..............................................................10

*Comm'r v. Keystone Consol. Indus., Inc.*,
508 U.S. 152 (1993)................................................................9

*Conkright v. Frommert*,
559 U.S. 506 (2010)..............................................................17

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)..............................................................20

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
9 F.4th 1167 (9th Cir. 2021) ..................................................17

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)..........................................................*passim*

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)..............................................................16

*Ramos v. Banner Health*,
1 F.4th 769 (10th Cir. 2021) ..................................................19

*Rush Prudential HMO, Inc. v. Moran*,
536 U.S. 355 (2002)..............................................................20

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
141 S. Ct. 474 (2020) .......................................................1, 3, 18

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019) ................................................*passim*

*Varsic v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
607 F.2d 245 (9th Cir. 1979)..................................................18

## TABLE OF AUTHORITIES
(continued)

Page(s)

### Statutes, Rules & Regulations

9th Cir. R. 35-1 ............................................................. 3

ERISA § 3,
    29 U.S.C. § 1002 .................................................... 11

ERISA § 404,
    29 U.S.C. § 1104 ............................................. *passim*

ERISA § 406,
    29 U.S.C. § 1106 ............................................. *passim*

ERISA § 408,
    29 U.S.C. § 1108 .................................... 3, 13, 17

Fed. R. App. P. 35 ....................................................... 3

*Reasonable Contract or Arrangement*
    *under Section 408(b)(2)—Fee Disclosure*,
    77 Fed. Reg. 5632 (Feb. 3, 2012) ............................ 13

### Other Authorities

Antonin Scalia,
    *A Matter of Interpretation:*
    *Federal Courts and the Federal System* (1997) .............. 16

Austin R. Ramsey & Jacklyn Wille,
    *9th Cir. AT&T Ruling 'Watershed Moment' for Benefit Contractors*,
    Bloomberg Law (Aug. 8, 2023) ............................. 1, 19

Brief for the United States as *Amicus Curiae*
    Supporting Petitioners in Part,
    *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)
    (No. 95-809), 1996 WL 99713 ............................ 12, 13

Fidelity,
    *2023 Plan Sponsor Attitudes Survey* (Mar. 2023) ............ 18

Kellie Mejdrich,
    *9th Cir. ERISA Fee Ruling May Spur High Court Intervention*,
    Law360 (Aug. 9, 2023) ...................................... 19

iii

## INTRODUCTION AND RULE 35(b) STATEMENT

Where ERISA is concerned, nationwide uniformity isn't just an ideal—it's an imperative. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 480 (2020) (Congress enacted ERISA "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law"). In a "watershed moment" for ERISA plans and plan sponsors, the panel decision violated that imperative—departing from Supreme Court precedent and splitting with the Third and Seventh Circuits.[1] Rehearing is needed to resolve these conflicts and restore uniformity on an important, recurring issue of ERISA law.

Section 406(a) of ERISA prohibits benefit plan sponsors from entering into certain agreements called "prohibited transactions." In *Lockheed Corporation v. Spink*, the Supreme Court reversed a decision of this Court and held that the "transactions" prohibited by ERISA must involve "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." 517 U.S. 882, 893 (1996).

---

[1] *See* Austin R. Ramsey & Jacklyn Wille, *9th Cir. AT&T Ruling 'Watershed Moment' for Benefit Contractors*, Bloomberg Law (Aug. 8, 2023), bit.ly/3P8seZm.

Faithfully following *Lockheed*, the Third and Seventh Circuits have held that arm's-length agreements to provide necessary plan services like recordkeeping are *not* categorically prohibited transactions. *Sweda v. Univ. of Pa.*, 923 F.3d 320, 336–37 (3d Cir. 2019); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 585 (7th Cir. 2022). As the Third Circuit explained, ERISA "acknowledges that certain services are necessary to administer plans" and so construing the same statute "to prohibit necessary services would be absurd." *Sweda*, 923 F.3d at 337.

But that is exactly the construction adopted by the panel decision here: it held that § 406(a) bars plans from entering *any* contract for plan services—even necessary services procured in an arm's-length transaction. Op. 12–13. In adopting this construction, the panel decision openly "disagree[d]" with the Third and Seventh Circuits. Op 21–27. If permitted to stand, the panel decision will allow wasteful litigation attacking routine, arm's-length agreements between ERISA plans and service providers, such as recordkeepers—all under a provision the Supreme Court has already held deals only with "plan insiders." *Lockheed*, 517 U.S. at 893. Ultimately, it will mean "lower returns for employees and higher costs for plan administration." *Albert*, 47 F.4th at 586. And it will

2

put plan sponsors in the impossible situation of administering ERISA plans where an agreement to provide necessary plan services is a prohibited transaction in one jurisdiction, but not in another.

That result is directly contrary to Congress's mandate that plans not be burdened with "complying with conflicting directives," or forced to "tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge*, 141 S. Ct. at 480. This Court should grant rehearing to resolve the "conflicting directives" created by the panel decision and restore nationwide uniformity on an exceedingly important issue of ERISA law. Fed. R. App. P. 35(b); 9th Cir. R. 35-1.

## BACKGROUND

ERISA requires plan fiduciaries—like employers who sponsor 401(k) plans for their workers—to act prudently, including with respect to fees paid to third parties who provide services to plans, such as recordkeeping or financial advising. 29 U.S.C. § 1104(a). In addition, ERISA categorically prohibits certain types of transactions between plans and third parties. 29 U.S.C. § 1106(a)(1). Plans may engage in these transactions only if they establish that one of the statutory exemptions applies. 29 U.S.C. § 1108(b)(2).

In *Lockheed*, the Supreme Court held that the "transactions" categorically prohibited by ERISA involve "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." 517 U.S. at 893. Following *Lockheed*, the Third and Seventh Circuits have held that arm's-length agreements to provide necessary plan services like recordkeeping aren't categorically prohibited transactions. *Sweda*, 923 F.3d at 336–37; *Albert*, 47 F.4th at 585–86.

Petitioner AT&T Services, Inc. administers the AT&T Retirement Savings Plan, a 401(k) defined contribution plan offered to eligible AT&T employees. 1-SER-4, 28. AT&T Services contracts with Fidelity Workplace Services to provide recordkeeping services to the Plan—including tracking participant contributions and investments, processing distributions, and answering participant questions. 2-SER-51–52; 5-ER-1156, 1204–17; 6-ER-1374–79, 1432–45. Fidelity charges the Plan a flat fee on a per-participant basis for those administrative services. 6-ER-1245, 1369.

Separately, Fidelity provides a service known as BrokerageLink, which gives Plan participants who choose to enroll expanded investment choices, including access to over 5,000 mutual funds. 2-ER-200–03. If

4

participants opt to use BrokerageLink, they pay for those services through their account in the 401(k) plan according to BrokerageLink's own commission schedule. 2-ER-201. Fidelity, in turn, may receive compensation from the mutual funds chosen by Plan participants for Fidelity's services to those funds—such as fund recordkeeping or shareholding services to fund families. 2-ER-200–01.

AT&T has further expanded the benefits it offers Plan participants by contracting with an investment advisor, Financial Engines. 5-ER-1044, 1049, 1058. For participants who choose this option, Financial Engines offers three tiers of service: (1) investment education, which is available to all participants for no additional fee; (2) greater access to investment research, which is available for an additional fee to participants who wish to perform their own trades; and (3) individualized investment management services, which is likewise available for an additional fee. 4-ER-638; 5-ER-1122–23; 1-ER-10.[2] In this way, each participant can select the desired level of service (and decide whether to incur an additional fee, paid through their account in the 401(k) plan to

---

[2] Initially, Financial Engines charged a flat, per-participant fee. That fee was eliminated in 2017. 4-ER-638; 1-ER-10.

Financial Engines, that may be associated with that level of service). 4-ER-638; 1-ER-10.

Financial Engines, in turn, pays Fidelity a portion of those fees received from the 401(k) plan participants to obtain access to Plan participants' accounts and personal data that is maintained by Fidelity, as recordkeeper, in its own database. 1-ER-10; 6-ER-1363. That access enables Financial Engines to advise those participants and execute trades on their behalf. AT&T isn't a party to the contract between Fidelity and Financial Engines. 1-ER-10; 6-ER-1363.

Plaintiffs are former AT&T employees who qualified for the Plan and filed this ERISA class action, alleging as relevant here that AT&T violated its duty of prudence in connection with the recordkeeping fees paid to Fidelity. 1-ER-20–23. Specifically, plaintiffs allege that AT&T failed to monitor how much compensation Fidelity received from BrokerageLink and Financial Engines, and to use this separate compensation to Fidelity to lower its recordkeeping fee. 1-ER-23–24.

Plaintiffs further allege that AT&T engaged in prohibited transactions under § 406(a)(1) by amending its recordkeeping agreement with Fidelity, which was providing services to the Plan at the time of the

amendment. 1-ER-26–28. The district court rejected plaintiffs' claims and granted summary judgment to AT&T. 1-ER-1, 25–26, 34.

The panel reversed in relevant part. Op. 5–6. It first concluded that, notwithstanding *Lockheed*, a prohibited transaction occurs under § 406(a)(1)(C) *any time* a plan enters any agreement with a service provider—even when that agreement is at arm's length and for necessary services. Op. 11–16. The panel then applied that expansive rule to hold that AT&T caused the Plan to enter a prohibited transaction when it amended the Plan's contract with Fidelity so that it could offer the services of BrokerageLink and Financial Engines to Plan participants. Op. 12.

## ARGUMENT

## I. The panel decision departs from Supreme Court precedent and creates a circuit split.

In addressing the prohibited-transaction claim, the panel wasn't writing on a clean slate. The Supreme Court had construed the very same ERISA provision at issue here in *Lockheed*, and other courts of appeals have faithfully followed that decision to reject the same types of claims at issue here. Yet the panel decision departed from *Lockheed* and openly split from the Third and Seventh Circuits. Rehearing is needed

7

to restore the national uniformity that ERISA demands and Supreme Court precedent requires.

## A. The panel decision departs from the Supreme Court's decision in *Lockheed*.

The panel construed § 406(a)(1) to categorically bar even arm's-length transactions for necessary services. That decision cannot be reconciled with the Supreme Court's construction of the same provision.

**1.** In *Lockheed*, the Supreme Court confronted § 406(a)(1)(D), which groups among "prohibited transactions" any transaction that "constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Lockheed's plan administrator had transferred "the Plan's surplus assets" to certain employees to procure releases of their claims against the employer sponsoring the plan; there was no dispute that such releases would benefit the employer, a party in interest. 517 U.S. at 885.

All parties in *Lockheed* agreed that § 406(a)(1)(D) couldn't be construed so broadly as to reach *all* payments to plan participants that benefit the employer. 517 U.S. at 892. After all, *every* payment to a participant helps the employer by, among other things, attracting and

8

retaining employees and protecting the employer from lawsuits for non-compliance. *See id.* at 893–94.

So the *Lockheed* plaintiffs proposed to narrow § 406(a)(1)(D) to cases where the benefit received by the employer was "not merely a 'natural inciden[t] of the administration of pension plans.'" 517 U.S. at 892 (alteration in original). Lockheed advocated a more categorical limitation that the payment of benefits to participants was "wholly outside the scope of § 406(a)(1)(D)." *Id.*

The Supreme Court agreed with Lockheed, holding that § 406(a)(1)(D) couldn't be read as broadly as plaintiffs sought, much less as far as its literal language might sweep. The Court reasoned that "Congress enacted § 406 'to bar categorically a transaction that [is] likely to injure the pension plan.'" 517 U.S. at 888 (alteration in original) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). Section 406(a)(1)(D), like the sections surrounding it (including the subsection at issue here, § 406(a)(1)(C)), bars only those transactions "that present a special risk of plan underfunding because they are struck with plan insiders, *presumably not at arm's length*." *Id.* at 893, 895 (emphasis added).

Under that construction, § 406(a)(1)(D) doesn't prohibit *all* payments that provide a benefit to the employer, just those that are "merely a sham transaction, meant to disguise an otherwise unlawful transfer of assets to a party in interest, or involve[] a kickback scheme." 517 U.S. at 895 n.8.

**2.** The Supreme Court's decision in *Lockheed* forecloses the panel's sweeping construction of § 406(a)(1)(C). This case involves precisely the type of "arm's length" "commercial bargain" for necessary services that falls outside the scope of § 406(a)(1) (and far short of the "sham" transaction referenced in *Lockheed*). *See* 517 U.S. at 893.

That conclusion is confirmed by placing § 406(a)(1)(C) within its statutory context. After all, it's a cardinal rule of statutory construction that provisions shouldn't be interpreted in isolation, but in the larger context of the statutory scheme as a whole. *Comm'r v. Engle*, 464 U.S. 206, 217, 223–24 (1984). Under § 404(a)(1)(A)(ii), plan fiduciaries are charged with paying the "reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii); *Sweda*, 923 F.3d at 337 ("ERISA specifically acknowledges that certain services are necessary to administer plans."). Reading § 406(a)(1) to categorically *prohibit* plan

10

fiduciaries from paying the same "reasonable expenses of administering the plan" (unless they can prove up one of the statutory exemptions) cannot be reconciled with § 404(a).

Yet that is precisely how § 406(a)(1)(C) operates under the panel decision. It yields a directive that an ERISA plan fiduciary "shall not cause the plan to engage in a transaction" for the "direct or indirect" "furnishing of goods, services, or facilities between the plan" and "a person providing services to such plan." 29 U.S.C. §§ 1106(a)(1)(C), 1002(14)(B). So under the panel decision, § 406(a)(1)(C) categorically prohibits fiduciaries paying for necessary plan services—exactly what § 404(a)(1)(A)(ii) categorically requires. That cannot be right. And it's not consistent with *Lockheed*.

**3.** To justify its departure from *Lockheed*, the panel decision offers several distinctions. None is persuasive.

*First*, the panel decision asserts that the transaction in *Lockheed*, unlike the one here, wasn't expressly covered by the statutory text. Op. 18–19. But neither the parties nor the Court in *Lockheed* held that view. The panel relies on the Court's statement that § 406(a)(1)(D) "does not in direct terms include the payment of benefits by a plan

administrator," *Lockheed*, 517 U.S. at 892, but ignores that the section *did* broadly reach any "direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  29 U.S.C. § 1106(a)(1)(D).

That statutory language unquestionably would have encompassed the "payment of benefits," and the Supreme Court never suggested otherwise.  The Court merely observed that this broad prohibition doesn't specify that the "payment of benefits" is one of the types of "transfer[s]" of "assets of the plan" that § 406(a)(1)(D) reaches—just as the broad prohibition of § 406(a)(1)(C) doesn't specify that it reaches arm's-length agreements.

Notably, the Solicitor General's *amicus* brief in *Lockheed* acknowledged that the transaction there came "within the literal text" of § 406.  Brief for the United States as *Amicus Curiae* Supporting Petitioners in Part at 7, *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) (No. 95-809), 1996 WL 99713.  Nonetheless, the provision can't "be read to prohibit all transactions that might be thought to fall within its literal terms, for under such a reading all benefit payments would be forbidden." *Id*. at 15.  Instead, the statutory language must be construed in the

12

context of ERISA's "overall structure." *Id.* at 16. Justice Thomas's *Lockheed* opinion accepted that theory and reversed this Court's decision to the contrary.

*Second*, the panel suggests that AT&T's contract with Fidelity *did* raise a "potential" for harm to Plan participants absent in *Lockheed*. Op. 20. But there is no basis in the record for that speculation, and nothing to suggest that AT&T ever, as the panel decision put it, "entered into bad deals." Op. 29. The panel decision can only invoke plaintiffs' "hypothes[es]" of "potential" harm, Op. 20—and at summary judgment, that isn't enough.

*Third*, the panel decision places great weight on a Department of Labor document explaining the Department's amendment of § 408(b)(2)'s implementing regulation. Op. 14–16 (citing *Reasonable Contract or Arrangement under Section 408(b)(2)—Fee Disclosure*, 77 Fed. Reg. 5632 (Feb. 3, 2012)). But that document merely restates the statutory language—it doesn't explain how that language should be construed, much less by courts. And to the extent it suggests that contracts with service providers can raise conflicts of interest, 77 Fed. Reg. at 5650, it supports, consistent with *Lockheed*, finding transactions prohibited

13

where such conflicts are proven.  No conflicts were even alleged, much less proven, here.

In the end, none of the panel decision's attempts to distinguish *Lockheed* justifies departing from it.  Rehearing is needed to bring this Court's decisions back into alignment with Supreme Court precedent.

## B.    The panel decision creates a circuit split.

In holding that § 406(a)(1) categorically bars even arm's-length transactions for necessary plan services, the panel decision forthrightly acknowledges its split with the Third and Seventh Circuits—explicitly "disagree[ing]" with those courts.  Op. 21–22, 27.  That is reason alone for rehearing, particularly given the imperative of nationwide uniformity where ERISA is concerned.

**1.**    In *Sweda*, the Third Circuit rejected the same "extremely broad" reading that the panel decision adopted here.  923 F.3d at 335–36.  Construing § 406(a) to "prohibit ubiquitous service transactions," as the panel decision does here, "leads to an absurd result" that the "Supreme Court similarly avoided" in *Lockheed*.  *Id.* at 336–37 (citing *Lockheed*, 517 U.S. at 892–93).  Because ERISA "acknowledges that certain services are necessary to administer plans," *id.* at 337 (citing 29

14

U.S.C § 1104(a)(1)(A)(ii)), interpreting § 406(a)(1) "to prohibit necessary services would be absurd." *Id*.

Instead, the Third Circuit held that the "more harmonious way to interpret the prohibited transactions listed in § 1106(a)(1) in the context of the statute as a whole" lies in the "Supreme Court's identification of the common thread in § 1106(a)(1), a special risk to the plan from a transaction presumably not at arm's length—and its determination that transactions that do not share that common thread are permissible." *Sweda*, 923 F.3d at 338.

**2.** The Seventh Circuit followed suit in *Albert* for the same reasons:

> As the Supreme Court recognized in *Lockheed*, § 1106(a)(1) prohibits transactions that "generally involve uses of plan assets that are potentially harmful to the plan." It would be nonsensical to read § 1106(a)(1) to prohibit transactions for services that are essential for defined contribution plans, such as recordkeeping and administrative services.

47 F.4th at 584–85 (internal citations omitted) (quoting *Lockheed*, 517 U.S. at 893).

The Seventh Circuit recognized that categorically barring plans from "outsourc[ing] tasks like recordkeeping" or "investment advising" ultimately means "lower returns for employees and higher costs for plan

15

administration." *Id.* at 586.  Like the Third Circuit, the Seventh Circuit avoided those serious practical consequences and hewed to the Supreme Court's interpretation of § 406(a)(1).

**3.**    The panel decision's fault-finding with *Sweda* and *Albert* only confirms the need for rehearing.  *See* Op. 21–28.  The panel decision's primary criticism of *Sweda* and *Albert* is that their reading of the statute is atextual.  Op. 22, 27.  But there's nothing atextual about refusing to myopically construe a statutory provision in isolation, wrenched from its statutory context—especially where ERISA is concerned.  After all, ERISA is "a comprehensive and reticulated statute," one that is "enormously complex and detailed" and "that resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251, 262 (1993).

That's why the Supreme Court in *Lockheed* took pains to consider the statutory provision in context—and why the Third and Seventh Circuits were right to follow *Lockheed* in rejecting any construction that would render the statute internally inconsistent and "nonsensical." *Albert*, 47 F.4th at 584–85; *see also* Antonin Scalia, *A Matter of Interpretation:  Federal Courts and the Federal System* 62 (1997) ("the

good textualist is not a literalist"); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 9 F.4th 1167, 1173 (9th Cir. 2021) ("literalism is not necessarily textualism"). Rehearing is needed to restore uniformity on an important, recurring issue of ERISA law.

**4**.    The conflict is made even worse by the panel decision's holding that to establish the reasonableness of fees under the § 408(b)(2) exemption to the prohibited transaction statute, plans must assess *all* third-party contracts and compensation—even those outside the plan's control. Op. 31.    It also imported that requirement into the duty of prudence. Op. 35.    This ignores, however, the disincentives that arise when plan fiduciaries are tasked with monitoring third-party compensation outside the plan's control and visibility.    *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010).    Rehearing is warranted for that reason, too.

## II.    The panel decision will have serious practical consequences.

In enacting ERISA, "Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" *Conkright*, 559 U.S. at 517 (alterations in original).    Now, though, plan sponsors are faced with conflicting precedents about something as basic

for plan administration as recordkeeping—making the burden of non-uniformity particularly onerous. *See Rutledge*, 141 S. Ct. at 480 (plan sponsors shouldn't face "complying with conflicting directives").

Crucially, the uniformity issue here isn't the standard concern that *different* actors in different places should be subject to the same federal law—it's a heightened concern that the *same* actor in different places should be subject to the same federal law. That's because ERISA's "liberal venue" and service provisions subject employers with a national presence to suit in most forums. *See Varsic v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 607 F.2d 245, 248 (9th Cir. 1979).

The practical consequences of the panel decision are serious. Plans routinely "outsource tasks like recordkeeping, investment management, or investment advising" to outside service providers specializing in that area. *Albert*, 47 F.4th at 586. A recent Fidelity study, for example, estimates that 94 percent of ERISA plans retain third-party advisors or consultants.[3] By categorically prohibiting such widespread, longstanding practices, the panel decision poses significant consequences for

---

[3] Fidelity, *2023 Plan Sponsor Attitudes Survey* (Mar. 2023), bit.ly/3YVoM7I (conducted by Harris Insights and Analytics).

18

employers and workers alike:  Requiring administrators to perform *all* necessary plan services results in "higher costs for plan administration" and "lower returns for employees." *Albert*, 47 F.4th at 586.

What's more, the panel decision threatens to unleash "a new wave of litigation that targets plans" simply for contracting at arm's length for necessary services—even if the fees were reasonable.  Austin R. Ramsey & Jacklyn Wille, *9th Cir. AT&T Ruling 'Watershed Moment' for Benefit Contractors*, Bloomberg Law (Aug. 8, 2023), bit.ly/3P8seZm; *see Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021) (warning that ERISA's prohibited-transaction provisions "cannot be used to put an end to run-of-the-mill service agreements, opening plan fiduciaries up to litigation merely because they engaged in an arm's length deal with a service provider").

And as commentators have warned, it "introduc[es] new doubts over what kinds of contracts require exemptive relief."  Ramsey & Wille, *9th Cir. AT&T Ruling 'Watershed Moment*.[4]  If, as happened here, an employer's efforts to increase options and offerings for its workers' 401(k)

---

[4] *See also* Kellie Mejdrich, *9th Cir. ERISA Fee Ruling May Spur High Court Intervention*, Law360 (Aug. 9, 2023), bit.ly/3KN9z2n.

plans end up only embroiling the employer in class litigation, ultimately plan participants will pay the price in the form of fewer options, higher administrative expenses, and lower returns.

In the end, ERISA "induc[es] employers to offer benefits by assuring a *predictable* set of liabilities." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002) (emphasis added). The uncertainty, confusion, and conflict left in the wake of the panel decision threatens to upend ERISA's "careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014) (internal quotation marks omitted). Rehearing is needed to dispel the uncertainty, resolve the conflict, and restore national uniformity.

## CONCLUSION

The Court should grant panel rehearing or rehearing *en banc*.

Dated:  September 1, 2023          Respectfully submitted,

 */s/ Ashley E. Johnson*
Allyson N. Ho
Ashley E. Johnson
  *Counsel of Record*
Paulette Miniter
Katie Rose Talley
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900
*aho@gibsondunn.com*
*ajohnson@gibsondunn.com*
*pminiter@gibsondunn.com*
*ktalley@gibsondunn.com*

COUNSEL FOR APPELLEES
AT&T SERVICES, INC. AND BENEFIT PLANNING INVESTMENT COMMITTEE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 21-56196

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 3,742 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | /s/ Ashley E. Johnson | **Date** | Sep 1, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11** *Rev. 12/01/2021*

## CERTIFICATE OF SERVICE

I certify that, on September 1, 2023, a true and correct copy of this brief was filed via the Court's CM/ECF system, which will send a notification of filing to all counsel of record.

*/s/ Ashley E. Johnson*
Ashley E. Johnson

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT J. BUGIELSKI; CHAD S. SIMECEK, individually as participants in the AT and T Retirement Savings Plan and as a representatives of all persons similarly situated, | No. 21-56196 |
| | D.C. No. 2:17-cv-08106-VAP-RAO |
| *Plaintiffs-Appellants*, | OPINION |
| v. | |
| AT&T SERVICES, INC.; AT&T BENEFIT PLAN INVESTMENT COMMITTEE, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief District Judge, Presiding

Argued and Submitted October 17, 2022
Portland, Oregon

Filed August 4, 2023

2    BUGIELSKI V. AT&T SERVICES, INC.

Before:  Richard A. Paez and Bridget S. Bade, Circuit Judges, and Raner C. Collins,[*] District Judge.

Opinion by Judge Bade

---

## SUMMARY[**]

### Employee Retirement Income Security Act

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the defendants in an ERISA class action brought by former AT&T employees who contributed to AT&T's retirement plan, a defined contribution plan.

Plaintiffs brought this class action against the Plan's administrator, AT&T Services, Inc., and the committee responsible for some of the Plan's investment-related duties, the AT&T Benefit Plan Investment Committee (collectively, "AT&T").  Plaintiffs alleged that AT&T failed to investigate and evaluate all the compensation that the Plan's recordkeeper, Fidelity Workplace Services, received from mutual funds through BrokerageLink, Fidelity's brokerage account platform, and from Financial Engines Advisors, L.L.C.  Plaintiffs alleged that (1) AT&T's failure to consider this compensation rendered its contract with Fidelity a

---

[*] The Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

"prohibited transaction" under ERISA § 406, (2) AT&T breached its fiduciary duty of prudence by failing to consider this compensation, and (3) AT&T breached its duty of candor by failing to disclose this compensation to the Department of Labor.

The panel reversed the district court's grant of summary judgment on the prohibited-transaction claim. Relying on the statutory text, regulatory text, and the Department of Labor's Employee Benefits Security Administration's explanation for a regulatory amendment, the panel held that the broad scope of § 406 encompasses arm's-length transactions. Disagreeing with other circuits, the panel concluded that AT&T, by amending its contract with Fidelity to incorporate the services of BrokerageLink and Financial Engines, caused the Plan to engage in a prohibited transaction. The panel remanded for the district court to consider whether AT&T met the requirements for an exemption from the prohibited-transaction bar because the contract was "reasonable," the services were "necessary," and no more than "reasonable compensation" was paid for the services. Specifically, the panel remanded for the district court to consider whether Fidelity received no more than "reasonable compensation" from all sources, both direct and indirect, for the services it provided the Plan.

For similar reasons, the panel also reversed the district court's summary judgment on the duty-of-prudence claim. The panel concluded that, as a fiduciary, AT&T was required to monitor the compensation that Fidelity received through BrokerageLink and Financial Engines. The panel remanded for the district court to consider the duty-of-prudence claim under the proper framework in the first instance.

On the reporting claim, the panel affirmed as to the compensation from BrokerageLink and reversed as to the compensation from Financial Engines. The panel concluded that AT&T adequately reported the compensation from Financial Engines on its Form 5500s with the Department of Labor, but it did not adequately report the compensation from Financial Engines because an alternative reporting method for "eligible indirect compensation" was not available.

---

**COUNSEL**

John J. Nestico (argued), Schneider Wallace Cottrell Konecky LLP, Charlotte, North Carolina; Todd M. Schneider and James A. Bloom, Schneider Wallace Cottrell Konecky LLP, Emeryville, California; Todd S. Collins and Ellen T. Noteware, Berger Montague PC, Philadelphia, Pennsylvania; Jason H. Kim, Schneider Wallace Cottrell Konecky LLP, Los Angeles, California; Eric Lechtzin, Edelson Lechtzin LLP, Newtown, Pennsylvania; Shoham J. Solouki, Solouki Savoy LLP, Los Angeles, California; for Plaintiffs-Appellants.

Ashley E. Johnson (argued), Paulette Miniter, and Katie R. Talley, Gibson Dunn & Crutcher LLP, Dallas, Texas; Nancy G. Ross, Mayer Brown LLP, Chicago, Illinois; for Defendants-Appellees.

**OPINION**

BADE, Circuit Judge:

The Employee Retirement Income Security Act of 1974 ("ERISA") establishes standards for employee benefit plans to protect the interests of plan participants. *See* 29 U.S.C. § 1001. To that end, ERISA imposes a duty of prudence upon those who manage employee retirement plans, prohibits plans from engaging in transactions that could harm participants' interests, and mandates disclosures to the United States Department of Labor.

Robert Bugielski and Chad Simecek ("Plaintiffs") are former AT&T employees who contributed to AT&T's retirement plan ("the Plan"), a defined contribution plan. They brought this class action against the Plan's administrator, AT&T Services, Inc., and the committee responsible for some of the Plan's investment-related duties, the AT&T Benefit Plan Investment Committee (collectively, "AT&T"). Plaintiffs allege that AT&T failed to investigate and evaluate all the compensation that the Plan's recordkeeper, Fidelity Workplace Services ("Fidelity"), received in connection with that role. Plaintiffs argue that (1) AT&T's failure to consider this compensation rendered its contract with Fidelity a "prohibited transaction" under ERISA § 406, (2) AT&T breached its duty of prudence by failing to consider this compensation, and (3) AT&T improperly failed to disclose this compensation to the Department of Labor.

The district court granted summary judgment in AT&T's favor. It concluded that Plaintiffs' prohibited-transaction and duty-of-prudence claims failed because AT&T had no obligation to consider this compensation. It also concluded

that AT&T was not required to disclose this compensation on its reports to the Department of Labor.

Because we conclude that AT&T was required to consider this compensation and report a portion of it, we affirm in part, reverse in part, and remand for further proceedings.

## I

## A

Fidelity has served as the Plan's recordkeeper since 2005. As recordkeeper, Fidelity performs various administrative functions, such as enrolling new participants in the Plan, maintaining participants' accounts, and processing participants' contributions to the Plan. In exchange for these services, Fidelity charges the Plan a flat fee for each participant. Fidelity also offers other services to participants on an as-needed basis, including administering loans and processing withdrawals. Fees for these transactions are charged directly to the Plan participant requesting the service.

In approximately 2012, AT&T amended its contract with Fidelity to provide Plan participants with access to Fidelity's brokerage account platform, BrokerageLink. For a fee, BrokerageLink allows participants to invest in mutual funds not otherwise available through the Plan. These fees are based on a brokerage commission schedule that Fidelity provides to participants. For example, a participant might pay a $75 fee to purchase shares of a particular fund.

In addition to the fees it receives from participants, Fidelity receives "revenue-sharing fees" from the mutual funds available through BrokerageLink. For example, if a participant invested in a mutual fund offered through

BUGIELSKI V. AT&T SERVICES, INC.                    7

BrokerageLink, the fund would pay Fidelity a percentage of the amount the participant invested. Participants have invested billions of dollars in these mutual funds, resulting in millions of dollars in revenue-sharing fees for Fidelity.

In 2014, AT&T contracted with Financial Engines Advisors, L.L.C. ("Financial Engines"), to provide optional investment advisory services to Plan participants. For an asset-based fee, Financial Engines would manage a participant's investments.[1]

However, to do so, Financial Engines needed access to participants' accounts. Accordingly, AT&T amended its contract with Fidelity to provide Financial Engines with this access. And in its contract with Financial Engines, AT&T authorized Financial Engines to contract directly with Fidelity to secure the requisite access. Financial Engines and Fidelity then entered into a separate agreement under which Fidelity received a portion of the fees Financial Engines earned from managing participants' investments. The compensation Fidelity received from Financial Engines was significant; in some years, Fidelity received approximately half of the total fees that Financial Engines charged participants, resulting in millions of dollars in compensation for Fidelity.

B

In their third amended complaint, Plaintiffs allege that AT&T violated several ERISA provisions by failing to consider the significant compensation that Fidelity received through BrokerageLink and Financial Engines.

---

[1] Initially, Financial Engines also charged a flat per-participant fee, but AT&T later renegotiated to eliminate this fee.

Plaintiffs first allege that AT&T's amendment of its contract with Fidelity to incorporate the services of BrokerageLink and Financial Engines was a prohibited transaction under § 406(a)(1)(C). *See* 29 U.S.C. § 1106. Section 406 "prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals," *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996), and § 406(a)(1)(C) specifically prohibits the "furnishing of goods, services, or facilities" between a plan and a "party in interest," 29 U.S.C. § 1106(a)(1)(C).

Although ERISA § 408 exempts certain transactions from § 406's reach, Plaintiffs argue that none of those exemptions applies to the transaction between AT&T and Fidelity. Specifically, Plaintiffs argue that this transaction was not exempt under § 408(b)(2), which exempts from § 406's bar service contracts or arrangements between a plan and a "party in interest" if (1) the contract or arrangement is reasonable, (2) the services are necessary for the establishment or operation of the plan, and (3) no more than reasonable compensation is paid for the services. 29 U.S.C. § 1108(b)(2); 29 C.F.R. § 2550.408b-2(a). For the contract or arrangement to be "reasonable," the party in interest must disclose to the plan's fiduciary all compensation the party expects to receive "in connection with" the services provided pursuant to the contract or arrangement.[2]    29 U.S.C. § 1108(b)(2)(B), 29 C.F.R. § 2550.408b-2(c)(1)(iv); *see also* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632-01 (Feb. 3,

---

[2] The party in interest must be a "covered service provider" and provide services to a "covered plan." 29 U.S.C. § 1108(b)(2)(B); 29 C.F.R. § 2550.408b-2(c)(1). AT&T does not dispute that Fidelity was a covered service provider and the Plan was a covered plan.

2012).  Plaintiffs argue that AT&T's amendment of the contract with Fidelity to incorporate Financial Engines's and BrokerageLink's services did not satisfy the requirements of § 408(b)(2) because AT&T failed to obtain the requisite disclosures of the compensation Fidelity received from these service providers or determine that such compensation was "reasonable."     29   U.S.C.   § 1108(b)(2);  29   C.F.R. § 2550.408b-2(a).

Plaintiffs also allege that AT&T violated § 404 and its duty to act prudently by failing to consider this compensation.  *See* 29 U.S.C. § 1104.  Section 404 imposes a duty of prudence upon fiduciaries, requiring them to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).

Finally, Plaintiffs allege that AT&T was required to include this compensation on its annual report, the "Form 5500."   ERISA requires a plan's administrator to file an annual report with the Department of Labor.  *See id.* § 1023. Subject to some exceptions, plan administrators are generally required to identify in the report any people or entities that received compensation for providing services to the plan, as well as the amount of compensation received. *Id.*  § 1023(c)(3);   Revision   of   Annual   Information Return/Reports, 72 Fed. Reg. 64731-01, 64739 (Nov. 16, 2007).  Plaintiffs allege that AT&T did not satisfy this obligation.

## C

The district court granted summary judgment in AT&T's favor.  The court addressed the § 404 duty-of-prudence claim

first, rejecting Plaintiffs' argument that a prudent fiduciary would have considered the compensation Fidelity received from Financial Engines and BrokerageLink. The court adopted the reasoning of another district court in *Marshall v. Northrop Grumman Corp.*, No. 2:16-cv-06794, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019), and concluded that Plaintiffs' argument "fails as a matter of law" because this sort of third-party compensation "exists independent of the Plan and stems from an agreement to which the Plan is not a party," so AT&T is not required to consider it.

The district court next rejected Plaintiffs' § 406 prohibited-transaction claim, concluding that even if a prohibited transaction occurred, AT&T satisfied the exemption requirements of § 408(b)(2). However, in its analysis of the exemption's "reasonable compensation" requirement, the district court considered only the recordkeeping expenses the Plan paid directly to Fidelity. Although Plaintiffs argued that the compensation Fidelity received from BrokerageLink and Financial Engines also must be considered, the district court rejected this argument for the same reason it rejected Plaintiffs' argument that AT&T violated its duty of prudence: AT&T "had no duty to investigate or consider the third-party compensation Fidelity was receiving from Financial Engines and/or BrokerageLink." The court also found that the remaining exemption requirements were satisfied because Fidelity provided adequate disclosure to AT&T of the compensation Fidelity would receive from Financial Engines and BrokerageLink, and there was no dispute that the services were necessary for the Plan.

Finally, the district court determined that Plaintiffs' reporting claim failed because AT&T accurately completed its Form 5500s. The court concluded that the compensation

from Financial Engines and BrokerageLink qualified as "eligible indirect compensation," and therefore AT&T properly used an alternative reporting method that did not require the amount of this compensation to be reported on the Form 5500.

## II

We review de novo a district court's decision to grant summary judgment. *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 713 (9th Cir. 2020). "We also review de novo the district court's interpretation of ERISA." *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 974 (9th Cir. 2012).

## III

## A

To address Plaintiffs' prohibited-transaction claim, we begin with the text of ERISA § 406. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000) ("In ERISA cases, '[a]s in any case of statutory construction, our analysis begins with the language of the statute . . . . And where the statutory language provides a clear answer, it ends there as well.'" (alterations in original) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999))).

Under § 406(a)(1)(C), a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). A "party in interest" includes "a person providing services to such plan." *Id.* § 1002(14)(B). Thus, the threshold question is whether AT&T, by amending its

contract with Fidelity to incorporate the services of BrokerageLink and Financial Engines, "cause[d] the plan to engage in a transaction" that constituted a "furnishing of goods, services, or facilities between the plan and a party in interest." *Id.* § 1106(a)(1)(C).

There is no dispute that Fidelity has been AT&T's recordkeeper since 2005 and "provid[es] services to" the Plan in that capacity. *Id.* § 1002(14)(B). Therefore, Fidelity has been a "party in interest" since that time. *Id.* Additionally, no one disputes that the transaction (the amendment of the contract between AT&T and Fidelity) constituted a "furnishing of . . . services." *Id.* § 1106(a)(1)(C). Under the plain and unambiguous statutory text, the contract amendment was a prohibited transaction under § 406(a)(1)(C).

Indeed, AT&T admits that the language of § 406(a)(1)(C) is "broad" and, if read literally, encompasses the transaction with Fidelity. AT&T argues, however, that Congress "never intended" for § 406(a) to be "so broad" that it would encompass "arm's-length service transactions." But, in contrast to AT&T's arguments based on Congress's purported intent, we have previously recognized § 406's "broad" scope, explaining that § 406 creates "a broad per se prohibition of transactions ERISA implicitly defines as not arm's-length." *M & R Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982); *see also* Ronald J. Cooke, ERISA Practice & Procedure § 6.49 (Dec. 2022 update) ("Since the prohibition against transactions between plans and parties in interest is per se in nature, a violation does not depend on whether any harm results from the transaction.").

Moreover, § 406(a)(1)(C) contains no language limiting its application to non-arm's-length transactions, and

accepting AT&T's "statutory intent" argument would undermine the scheme Congress enacted. Specifically, § 408(b)(2) broadly exempts from § 406's bar transactions for "services necessary for the establishment or operation of the plan." 29 U.S.C. § 1108(b)(2)(A). And the definition of "necessary" is similarly broad: a service is necessary if it "is appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained." 29 C.F.R. § 2550.408b-2(b). In other words, ERISA already contains an exemption for those "service transactions" that keep plans running smoothly, which are the very transactions AT&T argues should be exempt. We see no reason to fashion a judge-made exemption when Congress has already provided a statutory exemption.

We are particularly reluctant to adopt an atextual interpretation of § 406 because ERISA is "an enormously complex and detailed statute," *Conkright v. Frommert*, 559 U.S. 506, 509 (2010) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)), that is "the product of a decade of congressional study of the Nation's private employee benefit system," *Mertens*, 508 U.S. at 251. Indeed, because of ERISA's complex and carefully crafted nature, the Supreme Court has "been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (alteration in original) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)). Although the Court made this observation in a different context, we conclude that we should proceed in a similarly cautious manner and decline to read additional limitations, requirements, or exceptions into the statutory text.

## B

The Department of Labor's Employee Benefits Security Administration's ("EBSA") explanation for amending the regulation implementing § 408(b)(2) confirms our reading of § 406. In pertinent part, that explanation provides:

> The furnishing of goods, services, or facilities between a plan and a party in interest to the plan generally is prohibited under section 406(a)(1)(C) of ERISA. As a result, a service relationship between a plan and a service provider would constitute a prohibited transaction, because any person providing services to the plan is defined by ERISA to be a "party in interest" to the plan. However, section 408(b)(2) of ERISA exempts certain arrangements between plans and service providers that otherwise would be prohibited transactions under section 406 of ERISA.

Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019) ("Want to know what a rule means? Ask its author."). In other words, the explanation contemplates the sort of arm's-length transactions that AT&T argues § 406(a)(1)(C) was not intended to reach, confirms that these transactions "generally" are prohibited under § 406(a)(1)(C), and reiterates the role of § 408(b)(2) and its implementing regulation, 29 C.F.R. § 2550.408b-2, in providing relief from § 406's categorical bar of such transactions. Indeed, Fidelity correctly noted as much when it told AT&T that

although it might be "surpris[ing]" that contracts between "a plan and a service provider, like a recordkeeper, are prohibited transactions," plans are able to "routinely enter into contracts with service providers" because of § 408(b)(2)'s exemption.

Furthermore, when explaining its reasons for amending the regulation, EBSA provided an example of the application of § 406 and § 408 that refutes AT&T's argument that § 406 was not meant to reach the transaction in this case. After explaining that the complexity of compensation arrangements for retirement plan services required regulatory action, the agency noted that "[p]ayments from third parties and among service providers can create conflicts of interest between service providers and their clients." *Id.* at 5650. By way of example, it explained that there is a potential for conflicts when "a 401(k) plan vendor may receive 'revenue sharing' from a mutual fund that it makes available to its clients." *Id.* That is precisely the arrangement here between Fidelity and the mutual funds available through BrokerageLink. EBSA clearly recognized that such arrangements could lead to potential conflicts of interest and, as a result, required disclosure under § 408(b)(2) prior to a fiduciary's entry into this sort of arrangement.

Finally, we are persuaded by the Department of Labor's advisory opinion that a company that "provide[d] recordkeeping and related administrative services to retirement plans" and made available to those plans "a variety of investment options, including its own insurance company separate accounts and affiliated and unaffiliated mutual funds," would be "a party in interest with respect to

the plan" because it was "a provider of services."**[3]**   U.S.
Dep't of Labor, Opinion No. 2013-03A, 2013 WL 3546834,
at *1–2 (July 3, 2013).     The opinion states that
§ 406(a)(1)(C) "generally prohibit[s]" the furnishing of
goods, services, or facilities between a plan and a party in
interest, unless the exemption in § 408(b)(2) applies. *Id.* at
*2. Because the situation described in the advisory opinion
is remarkably similar to this case, it reinforces our
conclusion    that    § 406(a)(1)(C)   broadly   applies   to
transactions constituting a "furnishing of goods, services, or
facilities between the plan and a party in interest," and a
party is a "party in interest" if it "provid[es] services to" a
plan. 29 U.S.C. §§ 1002(14)(B), 1106(a)(1)(C).

C

In contrast to the statutory and regulatory text, as well as
EBSA's explanation of the revised regulation, AT&T relies
on three decisions to support its reading of § 406(a)(1)(C) as
excluding    arm's-length   transactions   from   the   statute's
definition of prohibited transactions: *Lockheed Corp. v.
Spink*, 517 U.S. 882 (1996); *Sweda v. University of
Pennsylvania*, 923 F.3d 320 (3d Cir. 2019); and *Albert v.
Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022). As set forth
below, we conclude that these cases either do not support
AT&T's position, or we decline to follow their reasoning.

---

[3] Agency interpretations "contained in formats such as opinion letters are
'entitled to respect'" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140
(1944), to the extent that they "have the 'power to persuade.'"
*Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting
*Skidmore*, 323 U.S. at 140).

1

The first case AT&T relies upon is *Lockheed Corp. v. Spink*, in which an employer amended its defined benefit plan to offer increased pension benefits, payable out of the plan's surplus assets, to employees who would retire early, under the condition that participants release any employment-related claims against the employer. 517 U.S. at 885. The plaintiff alleged that this payment of benefits was a prohibited transaction under § 406(a)(1)(D), which prohibits a fiduciary from causing a plan to engage in a transaction that constitutes a "transfer to, or use by or for the benefit of a party in interest, of any assets in the plan." *Id.* at 886, 892 (quoting 29 U.S.C. § 1106(a)(1)(D)). The plaintiff theorized that the release of employment-related claims by participants was a significant "benefit" for the employer under § 406(a)(1)(D). *Id.* at 893.

The Court rejected this theory, holding that "the payment of benefits pursuant to an amended plan, regardless of what the plan requires of the employee in return for those benefits, does not constitute a prohibited transaction." *Id.* at 895. The Court first recognized that § 406(a)(1)(D) "does not in direct terms include the payment of benefits by a plan administrator." *Id.* at 892; *see also id.* at 894 ("Section 406(a)(1)(D) simply does not address what an employer can and cannot ask an employee to do in return for benefits."). The Court then looked to "the surrounding provisions" of § 406 to determine whether the payment of benefits was a "'transaction' in the sense that Congress used that term in § 406(a)." *Id.* at 892–93. The Court concluded it was not, noting that § 406(a) involves "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Id.* at 893. The common thread among the transactions in

§ 406(a), the Court continued, "is that they generally involve uses of plan assets that are potentially harmful to the plan," whereas the "payment of benefits conditioned on performance by plan participants cannot reasonably be said to share that characteristic." *Id.*

The Court then considered the plaintiff's concession that there were "incidental" and therefore "legitimate" benefits that a plan sponsor might also receive from operating a pension plan, such as attracting and retaining employees or providing increased compensation without increasing wages. *Id.* The Court explained that it could not see "how obtaining waivers of employment-related claims" could "meaningfully be distinguished" from these other objectives the plaintiff admitted were permissible. *Id.* at 894. Thus, the Court concluded that there was "no basis in § 406(a)(1)(D) for distinguishing a valid from an invalid *quid pro quo*." *Id.*; *see also id.* at 895 ("When § 406(a)(1)(D) is read in the context of the other prohibited transaction provisions, it becomes clear that the payment of benefits in exchange for the performance of some condition by the employee is not a 'transaction' within the meaning of § 406(a)(1).").

AT&T relies on *Lockheed*'s statement that § 406 bars transactions "likely to injure the pension plan," *id.* at 888 (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)), to support its argument that § 406(a)(1)(C) was not meant to prohibit "the type of ubiquitous, arm's-length service transactions involved here." For several reasons, we disagree.

First, and most importantly, the text of § 406(a)(1)(D) did not support the *Lockheed* plaintiff's argument. The Court began its analysis with the statutory text and concluded that the text "does not in direct terms" include

"the payment of benefits" and "simply does not address what an employer can and cannot ask an employee to do in return for benefits." *Id.* at 892, 984. In contrast, § 406(a)(1)(C) does, "in direct terms," encompass the transactions here. There is no dispute that AT&T "cause[d] the plan to engage in a transaction" involving the "furnishing of . . . services" between "the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). And since it decided *Lockheed*, the Court has reiterated that courts "'must enforce plain and unambiguous statutory language' in ERISA, as in any statute, 'according to its terms.'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). Our approach does just that.

Second, no other authority supported the *Lockheed* plaintiff's argument. To the contrary, the Court observed that federal law "expressly approve[d]" the employer's strategy, and the Court noted its reluctance "to infer that ERISA bars conduct affirmatively sanctioned by other federal statutes" in the absence of "clearer indication than what [the Court had] in § 406(a)(1)(D)." *Lockheed Corp.*, 517 U.S. at 895 n.6. But here, AT&T identifies no equivalent law supporting its position, while Plaintiffs' position is reinforced by EBSA's explanation of the amendments to 29 C.F.R. § 2550.408b-2.

Third, the Court considered the "surrounding provisions" of § 406 and observed that the transactions identified in § 406 "generally involve uses of plan assets that are potentially harmful to the plan." *Id.* at 892–93. And while we are mindful that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Lockheed Corp.*, 517

U.S. at 895, we do not read this general statement as limiting § 406's scope or requiring that a transaction be harmful to be prohibited. Rather, this "general[]" observation explains why it made sense that the "direct terms" of the statute did not encompass the payment of benefits as a prohibited transaction. *Lockheed Corp.*, 517 U.S. at 892. The Court's analysis would have differed if the "direct terms" of § 406 had encompassed the transaction, *id.*, or if the "statutory scheme" had supported the plaintiff's argument, *Davis*, 489 U.S. at 809, as § 408(b)(2) and its implementing regulation do here. In short, our analysis is faithful to the Court's holding in *Lockheed*. Because the "direct terms" of § 406(a)(1)(C) encompass the transaction here, AT&T's contextual argument cannot create an exception to § 406(a)(1)(C) where one does not exist. *See Sulyma*, 140 S. Ct. at 777–78 (rejecting contextual argument because "that is simply not what [the statute at issue] says").

Fourth, while the payment of benefits in *Lockheed* could not "reasonably be said" to be "potentially harmful to the plan," 517 U.S. at 893, the transactions here have the potential to be harmful. Participants paid additional fees to use BrokerageLink and Financial Engines. In a defined contribution plan, like the Plan here, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses. Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 526 (2015). Therefore, if AT&T entered into bad deals—as Plaintiffs hypothesize—those fees could "significantly reduce" participants' assets. *Id.* Put differently, *Lockheed*

does not support AT&T's arguments because there is a fundamental difference between paying increased pension benefits to employees and authorizing transactions that generate millions of dollars for a party in interest. The text of § 406 recognizes this distinction. *Compare Lockheed Corp.*, 517 U.S. at 892 (stating that § 406(a)(1)(d) "does not in direct terms include the payment of benefits" as a prohibited transaction) *with* 29 U.S.C. § 1106(a)(1)(c) (explicitly prohibiting the "furnishing of . . . services" between a plan and a party in interest).

Finally, the Court's analysis in *Lockheed* emphasized the difficulty in distinguishing between those "benefits" the plaintiff conceded were proper under § 406(a)(1)(D) and those that were not. 517 U.S. at 894–95. There is no equivalent line-drawing concern here. To the contrary, adopting AT&T's position would implicate such a concern; a "standard that allows some [transactions with parties in interest] but not others, as [AT&T] suggests, lacks a basis" in § 406(a)(1)(C)'s categorical bar. *Id.* at 895.

For all these reasons, we do not believe *Lockheed* justifies a judicial override of § 406(a)(1)(C)'s unambiguous text.

2

We also find unpersuasive the Third Circuit's decision in *Sweda v. University of Pennsylvania*, which AT&T urges us to follow. In *Sweda*, the Third Circuit affirmed the dismissal of various claims alleging that the fiduciaries of the University of Pennsylvania's retirement plan entered into agreements with the plan's recordkeepers that constituted prohibited transactions. 923 F.3d at 324. The court found that the plaintiffs plausibly alleged that the recordkeepers— the equivalent of Fidelity here—were "parties in interest"

because they provided services to the plan. *Id.* at 339; *see* 29 U.S.C. § 1002(14)(B). And the court recognized that "it is possible to read [§ 406(a)(1)(C)] to create a per se prohibited transaction rule forbidding service arrangements between a plan and a party rendering services to the plan." *Sweda*, 923 F.3d at 339–40. Nevertheless, the court "declined" to follow that reading of § 406(a)(1)(C), and instead established a requirement that a plaintiff plead "factual allegations that support an element of intent to benefit a party in interest" to state a prohibited-transaction claim. *Id.* at 336, 338.

The court reasoned that because § 406(a)(1) was "designed to prevent 'transactions deemed likely to injure the . . . plan' and 'self-dealing,'" it seemed "improbable" that § 406(a)(1)(C) "would prohibit ubiquitous service transactions and require a fiduciary to plead reasonableness as an affirmative defense." *Id.* at 336 (alteration in original) (quoting *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 92 (3d Cir. 2012)). The court also reasoned that reading § 406(a)(1) "as a per se rule" would "miss the balance that Congress struck in ERISA" by "expos[ing] fiduciaries to liability for every transaction whereby services are rendered to the plan." *Id.* at 337. Finally, the court noted that § 404(a)(1)(A)(ii) "specifically acknowledges that certain services are necessary to administer plans," so interpreting § 406(a)(1) "to prohibit necessary services would be absurd." *Id.* at 337.

We disagree with this approach, which does not follow the statutory text. The Supreme Court has reiterated that "a reviewing court's 'task is to apply the text [of the statute], not to improve upon it.'" *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508–09 (2014) (alteration in original) (quoting *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989)). Despite recognizing that each

recordkeeper was a "party in interest" and that the transaction at issue fit within the terms of § 406(a)(1)(C), the Third Circuit "decline[d]" to apply the text of § 406, opting instead to create an intent requirement that the statute does not demand. *Sweda*, 923 F.3d at 336–37, 339. We believe our reading is more faithful to the text of § 406(a)(1)(C), which does not include any intent requirement. *See, e.g.*, *Lauderdale v. NFP Retirement, Inc.*, No. SACV 21-301 JVS (KESx), 2022 WL 422831, at *20 (C.D. Cal. Feb. 8, 2022) (stating, while referencing *Sweda*, that the court was "not inclined to impose an intent requirement that is not in the text of the statute").

Additionally, while the court noted that it seemed "improbable" that Congress intended to prohibit "ubiquitous service transactions," *Sweda*, 923 F.3d at 336, it did not consider EBSA's reasoning for amending § 408(b)(2)'s implementing regulation, which contemplates these very service transactions and confirms they are prohibited under § 406. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632 ("[A] service relationship between a plan and a service provider would constitute a prohibited transaction, because any person providing services to the plan is defined by ERISA to be a 'party in interest' to the plan.").

Moreover, in refusing to adopt "a per se rule," *Sweda*, 923 F.3d at 337, the court overlooked that the Supreme Court had already recognized that § 406 creates a per se rule. *Harris Tr. & Sav. Bank*, 530 U.S. at 241–42 ("Congress enacted ERISA § 406(a)(1), which supplements the fiduciary's general duty of loyalty to the plan's beneficiaries, § 404(a), by *categorically barring* certain transactions deemed 'likely to injure the pension plan.'" (emphasis added) (citation omitted)); *see also id.* at 252 (noting that

§ 406(a) creates "*per se* prohibitions on transacting with a party in interest").

And even assuming § 408(b)(2) "require[s] a fiduciary to plead reasonableness as an affirmative defense," *Sweda*, 923 F.3d at 336, the concern "that putting employers to the work of persuading factfinders that their choices are reasonable makes it harder and costlier to defend . . . ha[s] to be directed at Congress, which set the balance where it is," *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 101–02 (2008).  Congress has already set the balance here.

Finally, we disagree with the Third Circuit's reasoning that because § 404(a)(1)(A)(ii) "specifically acknowledges that certain services are necessary to administer plans," interpreting § 406(a)(1)(C) "to prohibit necessary services would be absurd."  *Sweda*, 923 F.3d at 337.  As an initial matter, we know that Congress recognized that § 406(a)(1)(C) would prohibit necessary services; that is why it created an exemption.  *See* 29 U.S.C. § 1108(b)(2)(A) (exempting contracts for "services necessary for the establishment or operation of the plan").

Moreover, while § 404(a)(1)(A)(ii) "acknowledges that certain services are necessary to administer plans," there are several reasons why it does not follow that it would be "absurd" for § 406 to prohibit necessary services.  *Sweda*, 923 F.3d at 337.  First, § 406(a)(1)(C) only applies to service contracts with a "party in interest," and therefore it poses no bar to contracts with parties that do not meet that definition. 29 U.S.C. § 1106(a)(1)(C).  Second, even if a party in interest were the sole provider of a necessary service, § 406(a)(1)(C) does not completely "prohibit necessary services" or "impede necessary service transactions." *Sweda*, 923 F.3d at 337–38.  Instead, it simply ensures that,

when transacting with a party in interest, a fiduciary understands the compensation the party in interest will receive from the transaction and determines that compensation is reasonable. *See* 29 C.F.R. § 2550.408b-2(a), (c), (d). This reading is consistent with ERISA's broader aim to protect plan participants, as well as §§ 406 and 408's aim to increase transparency around service providers' compensation and potential conflicts of interest. *See* 29 U.S.C. § 1001; Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632.

3

AT&T's reliance on *Albert v. Oshkosh Corp.* fares no better. In *Oshkosh*, the Seventh Circuit rejected the plaintiff's argument that "paying excessive fees" to the plan's recordkeeper and investment advisor "for Plan services" amounted to a prohibited transaction. 47 F.4th at 575–76, 584. The court acknowledged that "[u]nder a literal reading" of § 406(a)(1)(C) and the definition of "party in interest," ERISA "would prohibit payments by a plan to an entity providing services for the plan." *Id.* at 584. The court then cited *Sweda*, among other cases, as support that courts "have declined to read ERISA that way because it would prohibit fiduciaries from paying third parties to perform essential services in support of a plan." *Id.* Concluding that the transactions were prohibited would be "inconsistent with the purpose of the statute," the court reasoned, because it would be "nonsensical" to read § 406(a)(1) "to prohibit transactions for services that are essential for defined contribution plans, such as recordkeeping and administrative services." *Id.* at 584–85.

The court distinguished past precedent that did not "confront the circularity problem" present in § 406 because "the transactions at issue [in that case] did not transform the defendants into parties in interest." *Id.* at 585. Ultimately, the court concluded that prohibiting "routine payments by plan fiduciaries to third parties in exchange for plan services" would put plan participants in "a worse position" because plans could no longer "outsource tasks like recordkeeping, investment management, or investment advising." *Id.* at 585–86.

The nature of the "transaction" in *Oshkosh* is not entirely clear from the opinion. But considering the court's discussion of a "circularity problem," it appears the "transaction" was simply payment for the services that rendered the service provider a "party in interest" in the first place. *Id.* at 583–85.[4] In other words, the plaintiff argued that the recordkeeper became a "party in interest" by

---

[4] This understanding of the transaction at issue is further supported by the district court's decision and the plaintiff's allegations and briefing. *See Albert v. Oshkosh Corp.*, No. 20-C-901, 2021 WL 3932029, at *8 (E.D. Wisc. Sept. 2, 2021) (rejecting as "circular reasoning" the argument that "an entity which becomes a party in interest by providing services to the Plans has engaged in a prohibited transaction simply because the Plans have paid for those services" and concluding that allegations that the employer paid the service providers "excessive fees for their services, without more, do not state a prohibited transaction claim" (quotation omitted)); Brief for Appellant Andrew Albert at 45, *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022) (No. 21-2789), ECF No. 27 (arguing that because the employer "paid fees to [the service providers] with plan assets" and § 408(b)(2)'s exemption is an affirmative defense, the prohibited-transaction claim survives a motion to dismiss); Amended Complaint at 64–66, *Albert v. Oshkosh Corp.*, 2021 WL 3932029 (E.D. Wisc. Sept. 2, 2021) (No. 1:20-cv-00901-WCG), ECF No. 20 (alleging that the plan engaged in a prohibited transaction by "using assets of the Plan to pay" for "unreasonable" fees).

providing recordkeeping services to the plan, and the payment for those services amounted to a prohibited transaction. *See id.* at 584 ("Subsections (A) through (D) [of § 406] cannot be read to categorically prohibit the very transactions that cause a person to obtain the status of a party in interest." (quoting *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018)).

That was not the situation here, where Fidelity was a longstanding party in interest when AT&T amended its contract to incorporate additional services from new vendors, resulting in millions of dollars in compensation for Fidelity. To the extent the court in *Oshkosh* premised its decision on a situation inapposite from the one here, we find it unpersuasive.

To the extent the court was considering a situation similar to the one presented here, we simply disagree with its analysis. As in *Sweda*, the court in *Oshkosh* recognized that "a literal reading" of § 406(a)(1)(C) led to the conclusion that the transaction was prohibited, yet it concluded such a reading was "nonsensical." *Id.* at 584–85. And like the court in *Sweda*, it did not consider EBSA's explanation of its amendment of § 408(b)(2)'s implementing regulation; if the court had, it likely would have concluded that the "literal reading" is correct. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632 ("The furnishing of . . . services . . . between a plan and a party in interest to the plan generally is prohibited under section 406(a)(1)(C) of ERISA."). We are hard-pressed to find the best reading of the statutory text, as corroborated by the agency tasked with administering the relevant regulations, "nonsensical."

Finally, the court's suggestion in *Oshkosh* that § 406 would prevent plans from outsourcing recordkeeping and investment services also misses the mark.  47 F.4th at 585–86.  Section 406(a)(1)(C) is not a complete ban; instead, it requires fiduciaries, before entering into an agreement with a party in interest, to understand the compensation the party in interest will receive, evaluate whether the arrangement could give rise to any conflicts of interest, and determine whether the compensation is reasonable.  29 C.F.R. § 2550.408b-2; *see generally* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632-01.  Rather than frustrating "ERISA's statutory purpose," *Oshkosh*, 47 F.4th at 585, this scheme furthers it by ensuring fiduciaries understand the impact the transaction will have on participants' interests.  *See* 29 U.S.C. § 1001.

\*    \*    \*    \*

In sum, AT&T's arguments based on these cases cannot overcome the clear command of ERISA's text, as reinforced by the regulation implementing § 408(b)(2) and EBSA's explanation for its amendment.  Because amending Fidelity's contract constituted a prohibited transaction under § 406(a)(1)(C), we next consider whether the requirements for an exemption under § 408(b)(2) were satisfied.

## IV

Section 408(b)(2) provides relief from the prohibited-transaction bar for service contracts or arrangements between a plan and a party in interest if (1) the contract or arrangement is "reasonable," (2) the services are "necessary for the establishment or operation of the plan," and (3) no more than "reasonable compensation is paid" for the services.  29 U.S.C. § 1108(b)(2); 29 C.F.R. § 2550.408b-

2(a).  Only the first and third requirements are at issue here, as Plaintiffs agree that the services were "necessary."  *See* 29 C.F.R. § 2550.408b-2(b).

## A

Under § 408(b)(2)'s first requirement, for the contract or arrangement to be "reasonable," the party in interest (which must be a covered service provider and provide services to a covered plan, 29 C.F.R. § 2550.408b-2(c)) must disclose to the plan's fiduciary detailed information about all compensation the party expects to receive "in connection with" the services provided pursuant to the contract or arrangement.  29 C.F.R. § 2550.408b-2(c)(1)(iv).  Among other things, this includes (1) a description of all "direct compensation" the party expects to receive, and (2) a description of all "indirect compensation" the party expects to receive, including "identification of the services for which the indirect compensation will be received, identification of the payer of the indirect compensation, and a description of the arrangement between the payer and the [party in interest] . . . pursuant to which such indirect compensation is paid."[5]  *Id.* § 2550.408b-2(c)(1)(iv)(C)(1)–(2).

We need not address this requirement, however, because we conclude that remand is necessary for the district court to consider § 408(b)(2)'s third requirement: whether Fidelity received no more than "reasonable compensation" from all sources for the services it provided the Plan.

---

[5] "Direct" compensation is compensation "received directly from the covered plan," such as the recordkeeping fees AT&T paid Fidelity. 29 C.F.R.  § 2550.408b-2(c)(1)(viii)(B)(1).   "Indirect" compensation includes "compensation received from any source other than the covered plan."  *Id.* § 2550.408b-2(c)(1)(viii)(B)(2).

B

The parties dispute the meaning of "reasonable compensation" under the third requirement. *Id.* § 2550.408b-2(a)(3). AT&T asserts that "reasonable compensation" encompasses only the compensation Fidelity received directly from the Plan and its participants for recordkeeping, while Plaintiffs argue that the reasonableness of the compensation also includes the compensation Fidelity received from Financial Engines and BrokerageLink. The district court adopted AT&T's position, concluding that AT&T "had no duty to investigate or consider the third-party compensation Fidelity was receiving from Financial Engines and/or BrokerageLink, and therefore [its] failure to do so does not make [the] compensation agreement unreasonable."

The district court, relying on *Marshall v. Northrop Grumman Corp.*, had already concluded that AT&T had no duty to consider this compensation in its analysis of the duty-of-prudence claim. 2019 WL 4058583, at *11. The court applied this reasoning to the prohibited-transaction claim and analyzed whether Fidelity's recordkeeping expenses alone were reasonable.

Although *Marshall* is not binding on us, AT&T urges us to adopt its reasoning, as the district court did. The plaintiffs in *Marshall* argued that the fiduciary breached its duty of prudence under § 404 by failing to monitor the compensation the recordkeeper received from the plan's investment advice provider, Financial Engines.[6] *Id.* at *4,

---

[6] *Marshall* involved two different types of fees: "[d]ata connectivity fees," which Financial Engines paid the recordkeeper in exchange for receiving "up-to-date participant data in a timely manner and format" so

11.   The district court rejected this argument, stating that "ERISA does not require, as a matter of law," that fiduciaries monitor "the type of third-party fees at issue here" because those fees "are *not subject to* fiduciary *control*, the fees are not paid out of plan assets, and [the fees] are for services [the recordkeeper] provides to Financial Engines out of an independent business arrangement." *Id.* at \*11.

But this conclusion is refuted by EBSA's explanation of its amendments to § 408(b)(2)'s implementing regulation— which the *Marshall* court did not consider, as the plaintiffs brought their claim under § 404. *See id.* at \*10–11. EBSA stated explicitly that the information the party in interest must disclose to the fiduciary about the compensation it expects to receive "in connection with" the services provided "will assist plan fiduciaries in understanding the services *and in assessing the reasonableness of the compensation, direct and indirect,* that the [party in interest] will receive." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5635–36 (emphasis added).     Put differently, the regulation contemplates that the fiduciary will assess the reasonableness of the compensation that the party receives "directly from the covered plan," 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(1) (defining "direct compensation"), *and* "from any source other than the covered plan," *id.* § 2550.408b-2(c)(1)(viii)(B)(2) (defining "indirect compensation").

---

it could provide participants with investment advice, and fees from a "Master Service Agreement," under which the recordkeeper "agreed to provide data connectivity services and other services to enable Financial Engines to pursue sales opportunities within [the recordkeeper's] existing and potential client base."  2019 WL 4058583, at \*5, 11.

In amending § 2550.408b-2, EBSA explained that, when "evaluating the reasonableness" of the contract for services, "responsible plan fiduciaries have a duty to consider compensation that will be received by a [party in interest] *from all sources* in connection with the services it provides to a covered plan pursuant to the [party in interest's] contract or arrangement." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650 (emphasis added). EBSA further explained that the phrase "in connection with" should "be construed broadly" to encompass compensation the party receives "based in whole or in part" on its contract with the plan. *Id.* at 5637. Therefore, to the extent *Marshall* found that fiduciaries do not have a duty to consider "third-party fees," 2019 WL 4058583, at *11, it conflicts with the agency's purpose in amending § 408's implementing regulation, and we reject its reasoning.

Rather, to determine whether "no more than reasonable compensation is paid" for services under § 408(b)(2)'s exemption, 29 C.F.R. § 2550.408b-2(a)(3), a fiduciary must consider all compensation—direct and indirect—that the party in interest receives "in connection with" the services it provides to the plan under the contract. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650 ("In evaluating the reasonableness of contracts or arrangements for services, responsible plan fiduciaries have a duty to consider compensation that will be received by a covered service provider from all sources in connection with the services it provides to a covered plan pursuant to the service provider's contract or arrangement.").

This conclusion—that the fiduciary must consider all compensation the party in interest receives in connection

with the services it provides the plan—is required by the text of the regulation, conforms to the structure and purpose of § 408(b)(2)'s requirements, and is reinforced by EBSA's explanation for revising § 2550.408b-2. The first exemption requirement—that the contract or arrangement be "reasonable"—calls for the party in interest to disclose information to the fiduciary about the compensation the party in interest expects to receive in connection with the services provided under the contract with the plan. 29 C.F.R. § 2550.408b-2(c)(1)(iv). The third requirement—that "no more than reasonable compensation is paid"—expects a fiduciary to consider this information. As EBSA explained, the point of disclosure is to provide information from which the fiduciary can make responsible decisions for the plan. Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5634, 5635–36 (stating that the disclosure requirements "should be construed broadly to ensure that responsible plan fiduciaries base their review of a service contract or arrangement on comprehensive information," and that the disclosed information "will assist plan fiduciaries in understanding the services and in assessing the reasonableness of the compensation" the party will receive). Disclosure is pointless if the fiduciary has no obligation to consider the disclosed information.

Moreover, one of the primary purposes of amending § 408(b)(2)'s implementing regulation was to address "third-party fees," which the court in *Marshall* found fiduciaries need not consider. 2019 WL 4058583, at *11. EBSA was particularly concerned with the special risks presented by these fees. It recognized that "[p]ayments from third parties and among service providers can create conflicts of interest between service providers and their

clients," and these payments have "been largely hidden from view," thereby preventing fiduciaries "from assessing the reasonableness of the costs for plan services." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650.

EBSA therefore implemented the regulation to "improve . . . transparency" and make it easier for fiduciaries to satisfy their "duty to consider compensation that will be received by a [party in interest] from all sources in connection with the services it provides to a covered plan" under the contract. *Id.* (outlining these risks in section titled "*The Need for Regulatory Action*"). The purpose of the regulation is clear—indeed, Fidelity even informed AT&T that "the regulation is focused on the disclosure of indirect revenue."

In short, to determine whether "no more than reasonable compensation is paid" for a party in interest's services, EBSA envisioned that a fiduciary would consider the compensation received by the party "from all sources in connection with the services it provides to a covered plan pursuant to" the contract, not just the compensation the party receives directly from a plan. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650.

Here, that means AT&T needed to consider the compensation Fidelity received from Financial Engines and BrokerageLink when determining whether "no more than reasonable compensation" was paid for Fidelity's services. 29 C.F.R. § 2550.408b-2(a)(3). The district court did not engage in this analysis; it concluded that AT&T "had no duty" to consider this compensation and evaluated whether the recordkeeping expenses the Plan paid directly to Fidelity,

alone, were reasonable. We therefore remand for the district court to conduct this analysis in the first instance.

V

For similar reasons, we also reverse the district court's judgment in favor of AT&T on Plaintiffs' duty-of-prudence claim and remand for further proceedings. Plaintiffs assert that AT&T breached its duty of prudence under ERISA § 404 by failing to monitor the compensation Fidelity received through BrokerageLink and Financial Engines. *See* 29 U.S.C. § 1104(a)(1) (requiring a fiduciary to discharge his or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing" and for the "exclusive purpose" of "providing benefits to participants" and "defraying reasonable expenses of administering the plan").

AT&T again relies on *Marshall* as support for its argument that a fiduciary need not consider this compensation, and again this reliance is misplaced. As our prior discussion of Plaintiffs' § 406 prohibited-transaction claim demonstrates, AT&T was required to consider this compensation under §§ 406 and 408. Moreover, EBSA's explanation of the amendments to 29 C.F.R. § 2550.408b-2 explicitly envisions that fiduciaries will consider such compensation to satisfy their duty of prudence under § 404—directly refuting *Marshall*.

When amending § 2550.408b-2, EBSA explained that fiduciaries must have information about the compensation—direct and indirect—received by service providers like Fidelity "to satisfy their fiduciary obligations under ERISA [§] 404(a)(1) to act prudently." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632. These disclosures are necessary because

the duty of prudence requires a fiduciary to discharge his or her duties "solely in the interest of [plan] participants and beneficiaries" and for the purpose of "defraying reasonable expenses of administering" the plan. 29 U.S.C. § 1104(a)(1)(A)(ii). A fiduciary cannot do so, however, if he or she is unaware of how and to what extent a service provider is compensated. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5632 (stating that § 408(b)(2) requires service providers to disclose all compensation they receive in connection with a plan because "plan fiduciaries need this information, when selecting and monitoring service providers," to be able to "assess[] the reasonableness of the compensation paid for services and the conflicts of interest that may affect a service provider's performance of services" and satisfy their duty of prudence).

Indeed, EBSA amended § 408(b)(2)'s implementing regulation to better allow fiduciaries to fulfill their responsibilities. EBSA recognized that "the way services are provided to employee benefit plans and . . . the way service providers are compensated" had changed, making "it more difficult for plan sponsors and fiduciaries to understand what service providers actually are paid for the specific services rendered"—as "[§] 404(a)(1) of ERISA requires plan fiduciaries" to do. Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 Fed. Reg. 41600-01, 41600 (July 16, 2010) (interim rule); *see also* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5637–38 (final rule) (explaining how the final rule's disclosure requirements better enable "a responsible plan fiduciary" to understand "what compensation will be received and from

whom" so he or she can "make informed decisions about service costs and potential conflicts of interest").

AT&T counters that the duty-of-prudence claim must fail because Plaintiffs offered no expert testimony to establish that a prudent fiduciary would have considered the fees Fidelity received from BrokerageLink and Financial Engines. However, AT&T identifies no Ninth Circuit precedent suggesting that expert testimony is a prerequisite to a successful claim, and we decline to create a per se rule requiring such evidence. *See Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022) ("Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

Similarly, we cannot conclude that AT&T, in fact, considered these fees. AT&T does not even attempt to argue that it considered the compensation Fidelity received from the mutual funds available through BrokerageLink. And to support its argument that it considered the compensation Fidelity received from Financial Engines, AT&T cites testimony from an AT&T executive that he "took note of" that compensation and took it "into account." But another AT&T executive testified that "what Financial Engines and Fidelity worked out for fees, was between them," while another echoed that sentiment and suggested that AT&T "really didn't make an inquiry about whether [the fee paid by Financial Engines to Fidelity] was a reasonable" one. On balance, this conflicting testimony does not support AT&T's claim that it considered the compensation Fidelity received from Financial Engines.

On this record, we cannot conclude that AT&T satisfied its duty of prudence as a matter of law. We therefore remand for the district court to consider Plaintiffs' duty-of-prudence claim under the proper framework in the first instance. *See Nunez v. Duncan*, 591 F.3d 1217, 1222–23 (9th Cir. 2010) (in reviewing a district court's grant of summary judgment, we determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law" (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)).

## VI

Finally, we turn to Plaintiffs' reporting claim. Plaintiffs argue that AT&T breached its "duty of candor" by failing to accurately report on its Form 5500s the indirect compensation Fidelity received from Financial Engines and BrokerageLink. *See* 29 U.S.C. § 1023(c)(3). Plaintiffs seek injunctive relief requiring AT&T to correct the Form 5500s.

The Form 5500 requires plan administrators to identify service providers, like Fidelity, that receive a certain amount of compensation in connection with services rendered to the plan. U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Schedule C (Form 5500), at 1. Administrators generally must report the direct and indirect compensation that the service provider received. *See id.* at 3. However, if the indirect compensation qualifies as "eligible indirect compensation" and was adequately disclosed to the plan, an alternative reporting method is available. *Id.* Under those circumstances, the administrator can check a box on the Form 5500 indicating that the service provider received eligible indirect compensation without reporting the amount. *Id.*

AT&T contends that it properly used this alternative reporting method, while Plaintiffs argue that, even if the compensation from BrokerageLink qualified as eligible indirect compensation, it was reported incorrectly, and the compensation from Financial Engines was not eligible indirect compensation.  We address Plaintiffs' arguments in turn.

A

Plaintiffs argue that AT&T incorrectly reported Fidelity's compensation from BrokerageLink because the alternative reporting method is available only if the "*sole* compensation received by a recordkeeper is eligible indirect compensation," and Fidelity received other types of compensation.  But, as AT&T points out, if the service provider received compensation other than eligible indirect compensation, the plan administrator simply "must complete line 2" of the Form 5500, which AT&T did.  U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Instructions for Form 5500, at 28.  Plaintiffs do not acknowledge this portion of the Form or argue that AT&T needed to do something more on line 2.

Additionally, AT&T received the disclosures necessary to utilize the alternative method to report the BrokerageLink compensation.  *See id.*  AT&T received written materials from Fidelity disclosing (1) "the existence of" the compensation from the mutual funds available through BrokerageLink, (2) "the services provided for" the compensation (certain recordkeeping or shareholder services), (3) the "amount (or estimate) of the compensation or a description of the formula used to calculate or determine the compensation" (ranges of basis points or flat fees, depending on the fund), and (4) "the identity of the party or

parties paying and receiving the compensation" (Fidelity received the compensation from the mutual funds, their investment advisors, or their affiliates). *Id.*; *see also* Revision of Annual Information Return/Reports, 72 Fed. Reg. 64731-01, 64742 (Nov. 16, 2007) (stating these requirements). Therefore, we agree with the district court that AT&T adequately reported the compensation from BrokerageLink and affirm its judgment on this ground.

B

As to the compensation Fidelity received from Financial Engines, Plaintiffs challenge AT&T's position that this compensation was eligible indirect compensation. The Form 5500 instructions define "eligible indirect compensation," and we emphasize the portion of the definition on which AT&T relies:

> *[F]ees* or expense reimbursement payments *charged to investment funds and reflected in the value of the investment* or return on investment of the participating plan or its participants, finder's fees, "soft dollar" revenue, float revenue, and/or brokerage commissions or other transaction-based fees for transactions or services involving the plan *that were not paid directly by the plan or plan sponsor* (whether or not they are capitalized as investment costs).
>
> Investment funds or accounts for this purpose would include mutual funds, bank commingled trusts, including common and collective trusts, insurance company pooled separate accounts, and other separately

> managed accounts and pooled investment
> vehicles in which the plan invests.
> *Investment funds or accounts would also
> include separately managed investment
> accounts that contain assets of individual
> plans*.

U.S. Dep't of Labor, Emp. Benefits Sec. Admin.,
Instructions for Form 5500, at 28 (emphasis added).

AT&T asserts that the fees paid by Financial Engines to
Fidelity are "fees . . . charged to investment funds and
reflected in the value of the investment" because the fees
paid to Financial Engines "came directly from the
'investment funds' contributed by" Plan participants.[7]  In
other words, AT&T argues that these fees are "charged to
investment funds" because "investment funds" includes
"separately managed investment accounts that contain assets
of individual plans."

But a "separately managed investment account" is a
specific type of investment vehicle; it does not mean, as
AT&T asserts, simply an "investment account" that is
"managed" by an adviser like Financial Engines. Although
a separately managed account is a "portfolio[] of assets
managed by an investment adviser," it is "usually targeted
towards wealthy individual investors" and differs from a

---

[7] Plaintiffs do not dispute that these fees "were not paid directly by the
plan or plan sponsor."  Moreover, AT&T does not argue that the fees
paid by Financial Engines to Fidelity would qualify as any other type of
"eligible indirect compensation" as that term is defined in the
instructions for Form 5500.  *See* U.S. Dep't of Labor, Emp. Benefits Sec.
Admin., Instructions for Form 5500, at 28; *see also* Revision of Annual
Information Return/Reports, 72 Fed. Reg. at 64742 (EBSA's discussion
of the revisions to the Form 5500 reporting requirements).

typical investment account in which the average investor invests in bonds and mutual funds. Standards for Covered Clearing Agencies for U.S. Treasury Securities and Application of the Broker-Dealer Customer Protection Rule With Respect to U.S. Treasury Securities, 87 Fed. Reg. 64610-01, 64659 (proposed Oct. 25, 2022). Unlike with a mutual fund, in which an investor shares ownership of the underlying securities with other investors, an investor in a separately managed account directly owns shares of the individual securities, allowing for a high degree of personalized investment. BlackRock, Separately Managed Accounts to construct personalized portfolios, https://www.blackrock.com/us/financial-professionals/investment-strategies/managed-accounts [https://perma.cc/2YD8-ZZLN]; Investopedia, Should You Have a Separately Managed Account?, https://www.investopedia.com/articles/mutualfund/08/managed-separate-account.asp [https://perma.cc/MHU3-3A2B] (explaining that with a mutual fund, an investor "share[s] ownership of the underlying securities with all of the other investors in the fund," whereas with a separately managed account, an adviser purchases shares of specific companies—not shares of a mutual fund—on the investor's behalf).

Here, Financial Engines was not purchasing individual securities on behalf of Plan participants. Rather, Financial Engines considered a participant's age, risk tolerance, and other characteristics; provided recommendations on how the participant should invest his or her money; and allocated the participant's contributions among the Plan's "menu of investment alternatives." This does not constitute a "separately managed investment account." Therefore, AT&T's argument that the fees paid to Financial Engines

were "eligible indirect compensation"—and therefore did not need to be separately reported on the Form 5500—fails.

Nor can we affirm on any of the other grounds AT&T proposes.

AT&T invokes our decision in *Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2004), where we stated that to "establish an action for equitable relief under ERISA section 502(a)(3), the defendant must be an ERISA fiduciary acting in its fiduciary capacity," *id.* at 1178 (internal citations omitted), and must violate "ERISA-imposed fiduciary obligations," *id.* (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)).  AT&T argues that it did not act in a fiduciary capacity when completing the Form 5500, so Plaintiffs cannot establish a claim for equitable relief.[8]

But in *Mathews,* we made this statement in the context of a claim for breach of fiduciary duty, *see id.* at 1176, 1180 (stating that "[a]t issue here is an alleged violation of

---

[8] Plaintiffs sometimes frame their reporting claim as a breach of the "duty of candor," which we assume is in response to this language in *Mathews*. Because equitable relief under § 502(a)(3) is not limited to breaches of fiduciary duties, we do not decide whether a fiduciary "duty of candor" exists.

Additionally, contrary to AT&T's argument, Plaintiffs have not waived this claim.  Plaintiffs have not failed to argue before the district court that the reporting failures violated ERISA § 103.  *See* 29 U.S.C. § 1023.  Although Plaintiffs sometimes phrased this argument in terms of a "duty of candor" under § 404, Plaintiffs have regularly identified § 103 as authorizing their claim.  They have argued, at least as far back as their opposition to AT&T's motion to dismiss the second amended complaint, that they sought relief "under ERISA § 502(a)(3) enjoining [AT&T] from filing incomplete and inaccurate Annual Reports and to correct previous inaccurate disclosures *pursuant to* 29 U.S.C. [§] 1023(a)(2)."

[§] 404(a)(1)," which imposes the fiduciary duty of prudence), and the defendant specifically argued that it did not act in a fiduciary capacity when taking the actions at issue, *id.* at 1178. But ERISA's authorization of suits for equitable relief, § 502(a)(3), is not limited to claims against fiduciaries for breach of fiduciary duty. *See* 29 U.S.C. § 1132(a)(3). Instead, § 502(a)(3) authorizes a "participant, beneficiary[,] or fiduciary" to bring an action "(A) to enjoin any act or practice which violates *any provision of this subchapter or the terms of the plan*, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) *to enforce any provisions of this subchapter or the terms of the plan*." 29 U.S.C. § 1132(a)(3) (emphases added); *see also* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs about Retirement Plans and ERISA 14, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf [https://perma.cc/TJ3M-NDLV] ("[Y]ou have a right to sue your plan and its fiduciaries . . . [t]o address a breach of a plan fiduciary's duties; or [t]o stop the plan from continuing any act or practice that violates the terms of the plan or ERISA."). Some violations of ERISA involve a breach of fiduciary duty, as in *Mathews*, but ERISA has other "provisions" that can be violated. *See Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1029 (9th Cir. 2021) ("The [defendant's] escape from liability on the fiduciary duty claim does not necessarily exonerate it from its other statutory obligations.").

Indeed, in *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006), a *fiduciary* sued a *beneficiary* under § 502(a)(3), not for breach of fiduciary duty, but to enforce "the terms of the plan," 29 U.S.C. § 1132(a)(3). 547 U.S. at 359–61. The Court stated that the "only question"

regarding the applicability of § 502(a)(3)(B) was whether the requested relief was "equitable." *Id.* at 361. Therefore, we cannot read *Mathews* to impose the limitations AT&T suggests because such a reading would be in direct conflict with *Sereboff*—in which the defendant was a beneficiary, not "an ERISA fiduciary acting in its fiduciary capacity," *Mathews*, 362 F.3d at 1178, and which was brought to enforce the terms of the plan, not to remedy violations of "ERISA-imposed fiduciary obligations," *id.* (quotation omitted). And we have recognized that *Mathews* must be read in context, as we have framed the inquiry differently in other cases. *See, e.g.*, *Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 725 (9th Cir. 2021) ("A § [502(a)(3)] claim has two elements: '(1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan; and (2) that the relief sought is appropriate equitable relief.'" (quoting *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014)). Thus, Plaintiffs can bring an equitable reporting claim without a breach of fiduciary duty claim.

AT&T also argues that Plaintiffs' reporting claim must fail because Plaintiffs cannot show that any errors in the Form 5500s led to loss. But we have rejected this argument when the plaintiff seeks only equitable relief, as Plaintiffs do here. *See Shaver v. Operating Eng'rs Local 428 Pension Tr. Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003). Therefore, we reverse the judgment of the district court regarding AT&T's reporting of the compensation from Financial Engines.

## VII

Because the district court did not correctly apply the relevant substantive law to Plaintiffs' prohibited-transaction and duty-of-prudence claims, we reverse and remand for it

to do so. On Plaintiffs' reporting claim, we affirm the judgment of the district court as to the compensation from BrokerageLink and reverse as to the compensation from Financial Engines. Costs are awarded to Plaintiffs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**